## IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 3:2006-37 |
| | ) | |
| DANIYEL DIYN, | ) | JUDGE GIBSON |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

This matter comes before the Court on the Defendant's Motion to Suppress (Document No. 43). An evidentiary hearing was held on March 14, 2008. The Government filed its "Post-Hearing Brief" (Document No. 65) on April 21, 2008, the Defendant his "Brief in Support of Motions to Suppress" (Document No. 66) on April 22, 2008. This Court possesses subject matter jurisdiction of this alleged offense pursuant to 18 U.S.C. § 3231. Venue is proper in this judicial district in accordance with Federal Rule of Criminal Procedure 18.

## FINDINGS OF FACT

Pennsylvania State Police Trooper Glen Bard (hereinafter "Bard") is a computer forensic examiner who is trained in the matters of computer technology and methods used to evaluate computer hardware, software and networks to uncover evidence of crimes; "[a] great deal of [his] caseload includes child pornography investigations..." having conducted "in excess of 200" child pornography investigations and having applied for approximately "140" search warrants that concern child pornography. Hearing Transcript (Document No. 64)(hereinafter "HT"), pp. 5-7. Government Exhibit 1, a Commonwealth of Pennsylvania form application for a search warrant and affidavit of probable

cause made in support of the application, was completed by Bard and his co-affiant Pennsylvania State

Police Trooper Michael Taylor, (hereinafter "Taylor"). *See* Government Exhibit 1. According to

Government Exhibit 1, "On 3/31/2004 [Bard]was supplied with a NCMEC[1] cyber tip referral"

concerning two images labeled "img.10.jpg" and "img.1.jpg" which "NCMEC was able to confirm...

were both...child pornography." Government Exhibit 1 at p. 2. NCMEC obtained these images from

a web page associated with a Yahoo.com profile with a URL of http://photos.yahoo.com/sadiansaint;

the two images were eventually received by either Bard or Taylor[2] from "the Internet Crimes against

Children task force in Delaware County Pennsylvania." *Id.* at p. 2. The Affidavit of Probable Cause

in the next paragraph reads: "A careful review of the images was conducted by this officer, and many

of the images appear to be child pornography. The images were of young female children between the

ages of 7 and 12 in various states of undress." *Id.* at p. 3. Bard/Taylor "then began to attempt to

identify the person who created the web site." *Id.* at p. 3. With the assistance of NCMEC, Bard/Taylor

knew that the IP number [3] of 216.9.170.32 "of the person who posted the images" was "under the

domain of Western Pennsylvania Internet Access" and contacted a man named Roy Fritz at that access

provider who confirmed that it was under the provider's domain, but "that it was a dynamic IP. (Which

---

[1]"NCMEC" stands for National Center for Missing and Exploited Children (hereinafter "NCMEC"). Both parties agree as does the Court that NCMEC is a private non-profit organization which receives funding from the United States Government and is not a law enforcement agency.

[2]The Affidavit of Probable Cause is unclear as to which Trooper received the images as both Troopers signed the affidavit and the affidavit reads "The pictures were eventually forwarded to this officer...." Other references to "this officer" occur within the affidavit of probable cause. Despite the lack of clarity on this matter, it does not impact the Court's analysis other than not knowing which officer is performing the action described. In light of this ambiguity, the Court will refer to "Bard/Taylor" when such a reference occurs with the actions the Court is quoting or describing.

[3]IP number is the Internet Protocol number; this is the identifying number for each computer that is necessary for it to connect to the Internet. Government Exhibit 1, p. 6.

means the IP is not assigned to one specific computer.)" *Id.* at pp. 2, 3. Bard/Taylor then directed their

attention to the website in question contacting yahoo.com, and requesting the IP logs from the

"sadiansaint" profile but yahoo.com did not have any such logs; yahoo.com did reveal to the officers

the email address for the "sadiansaint" profile, "newd@shol.com", and that a second profile name for

the "sadiansaint" profile was "luversofyouth". Government Exhibit 1 at p. 3. Armed with this

information, Bard/Taylor then ascertained that the email address originated at the Somerset Computer

Center because "shol.com" is registered to that business. Government Exhibit 1, p. 3. Bard/Taylor then

learned from Somerset Computer Center that email addresses from "shol.com" are assigned to

"customers of Western Pa. Internet Access, which corroborates the information concerning the IP

number of the poster." *Id.* Bard/Taylor thereafter were given "the billing information for the e-mail

address of 'newd@shol.com'. The e-mail account [was] registered to and paid for by Daniyel Diyn,

526 Main Street Berlin Pa. 15530. [Bard/Taylor] also verified that the account [was] still active and

being used." *Id.*

Bard/Taylor confirmed through two other sources that the street address for the Defendant as

given to them by the Somerset Computer Center was correct; the Troopers then proceeded to detail

within the warrant application the habits and behavioral patterns of those individuals who possess

electronic images of child pornography and trade it on the Internet, particularly their manner of storing,

trading and using this illegal material. *Id.* at pp. 3-4. Bard/Taylor's description of these behaviors is

then followed with this paragraph:

> Based upon the foregoing, there is probable cause to believe that the files and
> documents identified and related documents pertaining to the procurement,
> attempted procurement, or possession/distribution of computer images depicting

the sexual conduct of children less than 18 years of age, in violation of Pennsylvania Crimes Code Section 6312 (b & d)- Sexual Abuse of Children (Distribution and Possession of Child Pornography) are located on the premises at 526 Main Street, Berlin, Pa. 15530.

*Id.* at p. 4. Bard and Taylor presented their search warrant application and affidavit of probable cause to an assistant district attorney from Somerset County, Pennsylvania for review and approval prior to presentation to the issuing authority, in this instance Magisterial District Justice Bell. HT, pp. 8-9. The two pictures, "img.10.jpg" and "img.1.jpg," were not attached to the warrant application or the affidavit of probable cause shown to Magistrate Bell. Government Exhibit 1; HT, p. 61. After obtaining the warrant, Bard and Taylor accompanied by the Chief of Police for Berlin, Pennsylvania and a Sheriff's deputy from Somerset County went to the address of 526 Main Street, Berlin, Pennsylvania in order "to execute the signed warrant". HT, p. 28.

Observing that the residence on the second floor of 526 Main Street was locked and no person was present in the home, the troopers went to the local post office and Berlin Council Chambers in order to locate Daniyel Diyn (hereinafter "Defendant"), the individual who Bard and Taylor believed to reside at that address based upon a records check of driver's license and public utility databases. HT, pp. 28-29, 40, 41. The troopers uncovered the identity of his place of employment and telephoned that establishment only to be told that the Defendant had left work so they proceeded back to 526 Main Street and parked in a "parking lot adjacent to the building" and waited for the Defendant to arrive. HT, pp. 29, 36. The troopers awaited the Defendant's arrival so as to avoid the need to forcibly open the residence in order to begin their search; after his arrival, Bard recognized the Defendant from his driver's license photo and stepped out of his vehicle, called out to the Defendant "Mr. Diyn" and the

4

Defendant and Bard and Taylor began to approach each other; the Defendant's wife and two children were also in the vehicle. HT, pp. 29-30, 41.

After approaching the Defendant, Bard identified himself as a State Police Trooper, displayed his badge to the Defendant and told him that he had a search warrant for the Defendant's residence; Bard thereafter identified Taylor and the other law enforcement officials with him and all parties were standing "beside a very small alley...outside in the parking lot." HT, p. 30. In response, the Defendant inquired about the subject of the search warrant to which Bard responded that they were searching for child pornography; Bard then asked if the Defendant was "sadiansaint" to which he responded "yes". HT, pp. 30-31, 42. Bard then asked the Defendant "is there child pornography in the house" and the Defendant responded "yes there will be." HT, p. 31. Bard then "told [the Defendant that] he was under arrest"[4] and that the officers were going to proceed with the search of his residence and he was given the opportunity to open the door to the residence; the Defendant agreed to open the door to the residence and thereafter Bard patted the Defendant for weapons. HT, p. 31. Bard then inquired of the Defendant "is there anything in the house that we need to know about before we enter the house" and the Defendant responded that there was; Bard asked this question to determine if there was anything that would be a threat to the officers' safety. HT, p. 31. The Defendant indicated that he wanted to show whatever this thing was to Bard and Bard agreed based on the condition that the Defendant remain near Bard when walking into the residence. HT, p. 31.

---

[4]The Court is aware that subsequent testimony of Bard indicates that he said to the Defendant that he was not under arrest. The Court reviewed the court reporter's notes and her audio recording of the proceeding and the record reveals that Bard's statement that the Defendant was under arrest was correctly transcribed. The Court has not credited the statements of Bard and Taylor made to the Defendant that he could leave and therefore, they are excluded from the findings of fact.

All four officers escorted the Defendant into his residence to execute the search warrant with Taylor leading the party, with the Defendant, Bard, the Chief of Police and the Sheriff's deputy following in that order. HT, p. 32. The Defendant thereafter lead them through one room and then into his kitchen, opened the refrigerator and removed two bags of what was proven to be marijuana, and placed it on the kitchen table at Taylor's direction; Bard questioned the Defendant if the marijuana is what he wished to reveal to the officers and if that was everything he wanted to show them and the Defendant indicated he had something else to reveal; the Defendant then opened a kitchen cabinet and removed a plate with drug paraphernalia[5], Bard asked again if that was all he wished to reveal, the Defendant said that there was one more matter and then lead Bard out of the kitchen, into a bedroom where there were marijuana plants and growing lights. HT, pp. 32-33. Bard then directed the Defendant to go into the kitchen and wait there while the search was conducted to which the Defendant complied; the Defendant's wife and two children then arrived at the residence and Bard told the Defendant that the three of them could leave, which they did. HT, pp. 33-34, 37, 43. After his family left, the Defendant stated that he wanted to speak with Bard and Taylor; Bard was in the process of executing the search warrant while the Defendant spoke with Taylor in the kitchen after Taylor read the Defendant his Miranda warnings (hereinafter "mirandized"). HT, pp. 34-35.

The Defendant was not free to move about the house while the search was being conducted for the sake of the officers' safety and preservation of any evidence being sought. HT, pp. 37-38. Prior to being mirandized, the Defendant related to Taylor that "a week or two previous there would have been

---

[5]The record is unclear as to whether the plate contained either tongs, rolling papers, hemostats, marijuana or all four of these items. For the present purposes, the lack of clarity is immaterial. HT, pp. 32-33, 43-44.

an entire garbage bag full of marijuana"; the Defendant "continued to give more and more information" so Taylor mirandized him by reading the Miranda warnings from a card produced by the Pennsylvania State Police that Taylor carries in his possession. HT, pp. 44-46. After being mirandized, the Defendant appeared to understand the warnings and indicated to Taylor that he would continue to speak to law enforcement; Taylor then telephoned another Pennsylvania State Police Trooper who specializes in illegal substance investigations in order to allow the Defendant to speak to that Trooper. HT, p. 46. Although the timing of his statements are unclear from the record, the Defendant after being mirandized and either prior to or after his conversation on the telephone made statements regarding "his tendencies to be aroused by the child pornography" and the Defendant also indicated he posted child pornography on the yahoo website, but "not in the recent past." HT, pp. 47-48. The Defendant made remarks about "child pornography" prior to being mirandized, but those remarks were not specifically recalled by Taylor; no direct questions were put to the Defendant until after he was mirandized. HT, pp. 50, 53. At some point during the search, Taylor and the Defendant exited the kitchen and went out of the apartment and downstairs to the bakery. HT, p. 50.

As a result of the search, and in addition to the marijuana and marijuana plants, the Pennsylvania State Police obtained "three computer systems, two laptops and a tower system,...several books that appeared to be images of some type of nudity, and Jack[6] Sturgess was the actual publisher of those books...a camcorder, and several VHS tapes." HT, p. 35. The Defendant indicated to Bard that one laptop was his, and the other laptop was his wife's and that his laptop, not his wife's, would contain

_____

[6]The inventory accompanying the search warrant application introduced as Government Exhibit 1 appears to use the name Jack, but the Court from prior experience with similar cases believes that the correct first name of this photographer is "Jacques."

child pornography. HT, pp. 36, 48. Any person could post pictures to the website http://photos.yahoo.com/sadiansaint, including the Defendant, although this fact was not present in the affidavit of probable cause. HT, p. 73, Government Exhibit 1.

## CONCLUSIONS OF LAW

The Fourth Amendment to the United States Constitution reads: "The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV. "Probable cause exists when 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)." *U.S. v. Grubbs*, 547 U.S. 90, 95, 126 S.Ct. 1494, 1499, 164 L.Ed.2d 195, 203 (2006).

> A magistrate judge may find probable cause when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). This Court must uphold the finding if the affidavit on which it was based provided a substantial basis for finding probable cause. *See id.* at 236; *Conley*, 4 F.3d at 1205; *Jones*, 994 F.2d at 1054, 1055. The Court need not determine whether probable cause actually existed, but only whether there was "a 'substantial basis' for finding probable cause." *Jones*, 994 F.2d at 1054; see *id.* at 1055, 1057. In making this determination, the Court confines itself "to the facts that were before the magistrate judge, i.e., the affidavit, and [does] not consider information from other portions of the record." *Id.* at 1055. "[T]he resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants." *Id.* at 1057-58 (quoting *United States v. Ventresca*, 380 U.S. 102, 109, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)).

*U.S. v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001).

[E]vidence obtained by state officers during a search which, if conducted by federal officers, would have violated the defendant's immunity from unreasonable searches and seizures under the Fourth Amendment is inadmissible over the defendant's timely objection in a federal criminal trial. In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed.

*Elkins v. United States*, 364 U.S. 206, 223-224, 80 S.Ct. 1437, 1447, 4 L.Ed.2d 1669, 1681(1960)(footnote omitted). *See also United States v. Stiver*, 9 F.3d 298, 300 (3d Cir. 1993)(citing *United States v. Rickus*, 737 F.2d 360 (3d Cir. 1984)). This Court finds that in a suppression hearing context originating from the issuance of a state search warrant, a district court evaluates the presence of probable cause under the Fourth Amendment in an application for a search warrant and its accompanying affidavit of probable cause from a state judge by referring to the elements of the state crime at issue in the search warrant. *See United States v. Dimas*, 418 F.Supp.2d 737, 741-742 (W.D.Pa. 2005)(addressing probable cause in the context of a violation of the Pennsylvania Vehicle Code); *see also United States v. Primo*, 223 Fed. Appx. 187, 190-191 (3d Cir. 2007)(finding that police officers conduct violating state criminal *procedure* rule was irrelevant to the controlling Fourth Amendment analysis).

It is beyond cavil that this Court and every other district court shall evaluate issues concerning the searches and seizures conducted by state law enforcement officers in accordance with the Fourth Amendment. However, contrary to the Government's argument, HT pp. 24-25 and Post-Hearing Brief (Document No. 65), p. 9, n.2, if the Court were to view the present affidavit of probable cause and application for a search warrant based upon both the Fourth Amendment/federal search and seizure law

*and* the elements of the federal crimes the Defendant is currently charged with (specifically 18 U.S.C. §§ 2252 (a)(1) (a)(2) (a)(4)(B)), such a principle would lead to absurd results. This is particularly so in circumstances when there exists no parallel federal statute for the alleged violation of state statutes set forth in an affidavit of probable cause because this would result in the absence of probable cause for the subsequently charged federal crimes every time. Therefore, in order to conduct a proper Fourth Amendment analysis concerning the existence of probable cause, the framework of probable cause must be set against the originally alleged crime or the evidence thereof so that probable cause can be evaluated under the Fourth Amendment: for instance, evidence that several hand to hand transactions involving the exhibition of cash and clear plastic baggies of white powder between one individual and many others on a street corner may establish probable cause to search the individual's person for cocaine, but not probable cause to search him for child pornography.

In the same vein, when a prosecution begins with state law enforcement officers enforcing state criminal codes and alleging a state crime for which they submit their evidence of probable cause to a local magistrate in order to obtain a search warrant, they must establish probable cause to search for evidence of that crime in accordance with that state's constitutional criminal procedure as applied to the contents of the affidavit of probable cause for the search warrant. When that same prosecution is later adopted by a United States Attorney's Office for federal prosecution, for federal prosecutors to establish that any evidence seized under that state search warrant issued is properly admissible, the admissibility of the evidence must adhere to the standards applicable under the Fourth Amendment, including the presence of probable cause, set against the backdrop of the state crime. In order to establish the existence of probable cause and the proper issuance of a search warrant under the Fourth

10

Amendment for any suppression issue in a pending federal prosecution that originated as a state prosecution, probable cause under the Fourth Amendment can only be measured against the alleged crimes that prompted the issuance of the search warrant under state law, not the alleged crimes set forth in the subsequent federal indictment, information, or complaint. To conclude to the contrary would require United States district courts to evaluate the presence of probable cause under the Fourth Amendment for the federal criminal allegations before them based upon a record that was initially developed for purposes of establishing the existence of a state criminal law violation. Such an evaluation would result in suppression under the Fourth Amendment every time because applications for search warrants in state courts will not be tailored to establishing probable cause as to *federal* crimes, only state crimes and thus fail (except by happenstance) because the affidavits of probable cause/applications for search warrants will only address evidence sufficient to establish probable cause based upon the elements of state crimes.

With regard to the issue of establishing the necessity for a search warrant seeking child pornography materials the Supreme Court has stated:

> "[W]e have never held that a magistrate must personally view allegedly obscene films prior to issuing a warrant authorizing their seizure. *See Lee Art Theatre, Inc. v. Virginia*, 392 U.S., at 637, 88 S.Ct., at 2104. On the contrary, we think that a reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue."

*New York v. P.J. Video, Inc.*, 475 U.S. 868, 874, 106 S.Ct. 1610, 1614, 89 L.Ed. 2d 871, 879 n. 5 (1986). Similar specificity in the description of child pornography to be seized would satisfy the Fourth Amendment in the absence of the presentation of such child pornography to Magistrate Bell in the case

11

*sub judice. See United States v. Smith*, 795 F.2d 841, 847 (9th Cir. 1986)("Obviously, presentation of the photos with the affidavit would have been the ideal course, and the record contains no hint of why this was not done. Nevertheless, we do not find this omission fatal to the warrant in light of the affidavit taken as a whole.") *United States v. Battershell*,457 F.3d 1048 (9th Cir. 2006); *United States v. Chrobak*, 289 F.3d 1043, 1045 (8th Cir. 2002) (citing *P.J. Video*). Because the two images in question were not shown to Magistrate Bell, this Court must consider the description provided in the affidavit of probable cause.

A nude picture of a minor is not *per se* violative of the federal or Pennsylvania statutes prohibiting the making, possession or distribution of child pornography. *United States v. Villard*, 700 F.Supp. 803, 8712 (D.N.J. 1988); *Commonwealth v. Savich*, 716 A.2d 1251, 1256 (Pa. Super. 1998). Bard and Taylor in their Affidavit of Probable Cause have indicated that NCMEC found the images labeled "img.10.jpg and img.1.jpg were both confirmed child pornography."Government Exhibit 1, p. 2. Bard/Taylor used only a minimal description of these images within the affidavit and the images are not attached to the affidavit or application of the search warrant. The question is whether the information set forth in the affidavit sets forth a substantial basis to support the magistrate's findings of probable cause.

It cannot be disputed that a magistrate or similar judicial authority, not NCMEC or a police officer, must determine the presence of probable cause in an application for a search warrant. *See Shadwick v. City of Tampa*, 407 U.S. 345, 348-350, 92 S.Ct. 2119, 2121-2123, 32 L.Ed.2d 783, 787-789 (1972)(probable cause determinations must be made by those individuals not involved with law enforcement). Therefore, in light of *Shadwick*, the conclusions of NCMEC that the two images in

question were "both confirmed child pornography" certainly does not establish probable cause.

Furthermore, it is unknown from the affidavit of probable cause that NCMEC[7] made its evaluation of

the images in conformity with what is outlawed by the Pennsylvania statute.

The Troopers had the images in their possession and nothing precluded them from presenting

them to the issuing authority. However, contrary to the arguments of the Defendant, *see* Defendant's

Brief in Support (Document No. 66), pp. 18-20, the Court finds that the Troopers in this instance or any

law enforcement personnel submitting an affidavit of probable cause in application for a search warrant

targeting the presence of child pornography are not required to present to the issuing authority the

suspected illegal images in order to establish probable cause and may alternatively proceed to describe

the images.[8] The Court finds that production of the illegal images or a sufficient description of the

images can both equally satisfy the Fourth Amendment's probable cause requirement and such a

---

[7]Without further explanation, NCMEC's conclusion that matter is "child pornography" can include a wide spectrum of images that are both legal and illegal under the Pennsylvania law and such a conclusion cannot form the basis for a determination of probable cause; conversely, this Court would be able to judicially notice the fact that the Pennsylvania courts have found that certain images are depictions of a "sexually prohibited act" under 18 Pa.C.S.A. § 6312(a) and such a judicially noticed fact would be relevant to establishing probable cause for a violation of § 6312(b) and/or (d).

[8]In examining this issue, the First Circuit has observed that in order to establish the necessity for a search warrant seeking child pornography, either the suspected child pornography or a sufficient description shall be included with the application for a search warrant so that the issuing authority can conclude that there is a fair probability that criminal activity is occurring or is about to occur, *United States v. Syphers,* 426 F.3d 461, 466-467 (1st Cir. 2005) ("The best practice is for an applicant seeking a warrant based on images of alleged child pornography to append the images or provide a sufficiently specific description of the images to enable the magistrate judge to determine independently whether they probably depict real children. An officer who fails to follow this approach without good reason faces a substantial risk that the application for a warrant will not establish probable cause. *See Brunette,* 256 F.3d at 20."); *see also United States v. Brunette,* 256 F.3d 14, 17-19 (1st Cir. 2001)(absent a review of images by the magistrate or a description of them within the "warrant affidavit", law enforcement officer's conclusion as to illegality of images does not establish probable cause); *United States v. Weider,* No. 3:2005-cr-165, slip op. at 4-5 (M.D.Pa. July 31, 2007)(finding the lack of description of the images containing nudity and "sexual acts" insufficient establish probable cause for a violation of 18 Pa.C.S.A. § 6312(Sexual Abuse of Children)); absent presentation of images or alternatively, a description of them, an application for a search warrant cannot be said to have demonstrated probable cause under the Fourth Amendment that child pornography is present in the place to be searched.

13

conclusion is consistent with the Supreme Court's ruling in *P.J. Video, Inc., supra.*

The Troopers described their survey of the images: "A careful review of the images was conducted by this officer, and many of the images appear to be child pornography. The images were of young female children between the ages of 7 and 12 in various states of undress." Government Exhibit 1, p. 3. The Troopers were attempting to relate a description of their evidence that would establish probable cause for a violation of 18 Pa.C.S.A. § 6312. Section 6312 prohibits, *inter alia,* the photographing or filming of a "child under the age of 18" "engag[ing] in [or simulation of] a prohibited sexual act" (§ 6312(b)) or the possession of matters depicting "child under the age of 18" "engag[ing] in [or simulation of] a prohibited sexual act" (§ 6312(d)). Section § 6312(a) reads: "(a) Definition.--As used in this section, "prohibited sexual act" means sexual intercourse as defined in section 3101 (relating to definitions), masturbation, sadism, masochism, bestiality, fellatio, cunnilingus, lewd exhibition of the genitals or nudity if such nudity is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction."

The Court reads the Troopers' observation that "the images appear to be child pornography" as a description, not a conclusion. "Pornography" is defined as "the presentation of sexually explicit behavior, as in a photograph, intended to arouse sexual excitement." Webster's II New College Dictionary 860 (2001). "[C]hild pornography" coupled with the sentence "[t]he images were of young female children between the ages of 7 and 12 in various states of undress" represents to the Court that the images were not just of nude children, but nudity of a nature intended "for the purpose of sexual stimulation or gratification or any person who might view such depiction." 18 Pa.C.S.A. § 6312(a). The Troopers' description of the nudity in question is minimal and while not including the preferable

14

amount of detail describing the violation of the Pennsylvania statute, the Court finds it sufficient after considering the totality of the circumstances. *See United States v. Cochran*, 806 F.Supp. 560, 563 (E.D.Pa. 1992)(recognizing the absence of a description of a crime "does not preclude a finding of probable cause" under the *Gates* totality of the circumstances approach); *contra, Weider, supra.*

In light of the Troopers' experience in law enforcement with child pornography and their experience as adults generally and as police officers, the Court also accepts their evaluation of the ages of the individuals depicted in the two images they describe in the affidavit of probable cause.

Supporting the presence of probable cause is the actual email address of the Defendant, "newd@shol.com" and his sec ond screen name "luversofyouth"; this information would seem consistent with the information that the Defendant has pornographic (sexually explicit behavior intended to arouse sexual excitement) images of nude minor children on his yahoo website.

Finally as to the Defendant's contention that the affidavit of probable cause lacked sufficient evidence to allow the magistrate to conclude that the two images in issue would be found on the Defendant's computer, as opposed to a yahoo server or the computer operated by the poster of said images, the Court finds the affidavit sufficiently describes the Troopers' process of investigation which in turn presents a substantial basis to uphold the magistrate's issuance of the search warrant. The Troopers were aware of the IP address of the poster from information provided by NCMEC. However, that IP address only permitted them to conclude that the poster of the images had his/her internet access through Western Pennsylvania Internet Access. The IP turned out to be a dynamic IP, that is an IP not specific to one computer, but utilized by many. The Troopers then turned to the actual website where the pictures were displayed. The creator of the website had the "newd" email address and the additional

15

profile name of "luversofyouth". Following up on the "newd" email address, it was discovered that that

account was an address from Western Pennsylvania Internet Access, the same domain server for the

poster of the images on the website. The Defendant's name was on that account along with his physical

address. His physical address was verified through other sources. The profile name and email address

along with the matching of the same domain server between the poster of the images and the creator

of the website coincided with the Defendant's identity. All of this information provide a substantial

basis for the magistrate's conclusion that the Defendant was in possession of the two images in

question.

Under the totality of the circumstances, the description of the two images, the email address and

the second profile name along with the statements of the Troopers that the pictures they viewed are

"child pornography" as a whole provided a substantial basis for the magistrate's finding of probable

cause of a violation of 18 Pa.C.S.A. § 6312.[9]

Finally, the Defendant also challenges his statements to Troopers made on the day they executed

the search warrant. The warning against self-incrimination must be read to a suspect only when he is

in custody and a questioning or interrogation of that suspect begins. *See Berkemer v. McCarty*, 468

U.S. 420, 428-429, 104 S.Ct. 3138, 3144, 82 L.Ed.2d. 317, 327-328 (1984). As the Supreme Court

originally stated in *Miranda v. Arizona*: By custodial interrogation, we mean questioning initiated by

law enforcement officers after a person has been taken into custody or otherwise deprived of his

freedom of action in any significant way. *Miranda v. Arizona* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612

---

[9]In upholding the search warrant, the Court does not address the good faith exception of *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

(1966).

> Courts consider a variety of factors when determining if a person was in custody, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the location or physical surroundings of the interrogation; (3) the length of the interrogation; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) whether the suspect voluntarily submitted to questioning.

*U.S. v. Willaman*, 437 F.3d 354, 359 -360 (3d Cir. 2006).

The Defendant was not in custody when he was asked by Bard if there was child pornography in his home and his admission that such matter would be found in his home presented sufficient probable cause to place him in custody and arrest him for possessing such matter in violation of Pennsylvania law. Despite being approached by four police officers, there was no indication that prior to the Defendant being informed that he was under arrest that he could not reasonably believe that he was not free to leave the four police officers' presence. The officers approached the Defendant as they stood in a parking lot, there is no evidence that any of the officers were "coercive" or forceful or otherwise restrained the Defendant's movement, the Defendant submitted to voluntary questioning after being informed of the subject matter of the search warrant, and the questioning was limited to the exchange of three questions between the Defendant and Bard before the Defendant was told he was under arrest. *See* Findings of Fact 19-22.

After Bard told him he was under arrest, the Defendant was clearly in custody and no reasonable person could believe he was not within police custody. Trooper Taylor later mirandized the Defendant while both were present in his apartment and prior to the time when the Defendant made statements regarding being aroused by child pornography, that he posted pictures to his yahoo website in the past

17

and that his computer would have child pornography on it; alternatively, if the Defendant had not been mirandized, said statements are still admissible as the Defendant waived his Fifth Amendment right to remain silent by making admissions without questioning by Trooper Taylor.

## CONCLUSION

There is a substantial basis to uphold Magistrate Bell's finding of probable cause in approving Troopers Bard and Taylor's application for a search warrant of the Defendant's residence. Additionally, the statements of the Defendant made in answering Trooper Bard's questions regarding his profile name and the presence of pornography are admissible and do not violate *Miranda*. The Defendant was thereafter placed under arrest and was not questioned prior to being Mirandized by Trooper Taylor while he and the Defendant remained in the Defendant's kitchen while the search warrant was executed. Therefore, statements made by the Defendant prior to and after being Mirandized are admissible against him at the time of trial.

**AND NOW** , this 18th day of July, 2008 after consideration for the Defendant's Motion to Suppress (Document No. 43), IT IS HEREBY ORDERED THAT the motion is DENIED.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

18